1
287

**WINET, PATRICK & WEAVER**
A LAW CORPORATION
440 SOUTH MELROSE DRIVE, SUITE 200
VISTA, CALIFORNIA 92081-6666
TELEPHONE (760) 758-4261
FACSIMILE (760) 758-6420

**SAN DIEGO OFFICE**
401 WEST A STREET, SUITE 1400
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 702-3902
FACSIMILE (619) 702-5432

**PALM SPRINGS OFFICE**
340 SOUTH FARRELL DRIVE, SUITE A202
PALM SPRINGS, CALIFORNIA 92262
TELEPHONE (760) 416-1400
FACSIMILE (760) 416-1405

March 31, 2008

Christopher E. Angelo
Angelo & Di Monda
1721 N. Sepulveda Boulevard
Manhattan Beach, CA 90266-5014

Re:     Tran v. Arrellano
        Our File:  P21084

Dear Mr. Angelo:

I am in receipt of Mr. Angelo's March 25, 2008 letter.  He correctly states that he spoke with me on March 19, 2008.  Thereafter, Mr. Allen and I attempted to reach one another by phone, and recently spoke by phone on March 31, 2008.  At the time of that phone call, my understanding was that Mr. Allen stated that he would be responding on behalf of Progressive Insurance.  I also informed Mr. Allen that I would be preparing my own separate letter to all persons involved.

Prevoiulsy, I explained that Mr. Arrellano was not agreeable to signing the original Covenant provided by Mr. Angelo's office.  However, Mr. Arrellano was and is willing to sign a Covenant Not to Execute wherein he is protected individually, and Mr. Tran is able to pursue his case against Progressive in the future.  Consistent with Mr. Angelo's March 25, 2008 letter, we have prepared a proposed revised Covenant Not to Execute.  This proposed revised Covenant Not to Execute incorporates the individual protection of Mr. Arrellano, Mr. Tran's ability to pursue a future case against Progressive if he desires to do so, and Progressive's agreement that they are not waiving any of their rights to defend such action.  This proposed document is attached for the review of Mr. Angelo and Progressive Insurance.  Please advise me if this Covenant Not to Execute is agreeable.

Sincerely,

WINET, PATRICK & WEAVER

Randall L. Winet

RLW:cr
Enclosure
cc:  Sean Allen
     James McLaughlin

# COVENANT NOT TO EXECUTE OR ENFORCE JUDGMENT

## I.

### DEFINITIONS

A.  "PROMISOR" shall refer to BUN BUN TRAN, individually, by and through his mother and Guardian ad Litem, LE THI NGUYEN and their heirs, executors, administrators, successors, assigns, personal representatives, and agents.

B.  "PROMISEE" shall refer to LEONEL ARRELLANO and his heirs, executors, administrators, successors, assigns, and agents.  The term "PROMISEE" shall not include or refer to the insurer of Leonel Arrellano, Progressive Casualty Insurance Company, Progressive West Insurance Company, Progressive Insurance Company, and other Progressive entities (hereinafter referred to as "PROGRESSIVE").

C.  "INCIDENT" shall refer to any and all claims, actions, causes of action, or administrative proceedings of whatever kind or nature which PROMISOR now has or may hereafter have against PROMISEE which were or could have been brought in Superior Court Case No. 37-2007-00065432-CU-PA-CTL.

D.  "CIVIL ACTION" shall refer to the San Diego Superior Court action entitled *Bun Bun Tran v. Leonel Arrellano, et al.*, San Diego Superior Court Case No. 37-2007-00065432-CU-PA-CTL.

E.  Other definitions may appear throughout this agreement.

## II.

### RECITALS

A.  PROMISEE had a policy of insurance through PROGRESSIVE with policy limits of $15,000 per person and $30,000 per occurrence at the time of the INCIDENT.

1

B.    PROMISORS and PROMISEES are currently engaged in litigation entitled *Bun Bun Tran v. Leonel Arrellano, et al.*, San Diego Superior Court Case No. 37-2007-00065432-CU-PA-CTL (hereinafter referred to as "THE ACTION.").

C.    Certain issues have been raised pertaining to the alleged failure to settle all of PROMISOR'S bodily injury claims against PROMISEE on the part of Progressive Casualty Insurance Company, Progressive West Insurance Company, Progressive Insurance Company, and other Progressive entities (hereinafter referred to as "PROGRESSIVE").

D.    It is contended that PROGRESSIVE breached the implied covenant of good faith and fair dealing and/or otherwise acted negligently or tortiously toward PROMISOR and/or PROMISEE, and as a direct result, PROMISEE is now personally exposed to an adverse judgment in favor of PROMISOR in the action in excess of PROMISEE'S liability insurance policy limits.

E.    PROMISORS AND PROMISEES wish to set forth herein their respective rights and obligations with regard to the continued prosecution and resolution of the action as well as their liabilities, exposures, and risks relating thereto.

F.    It is understood and intended that this agreement constitutes a compromise of disputed claims and is not to be construed as an admission of liability on the part of any party referred to herein.

### III.

### <u>CONSIDERATION, PROMISES, AND AGREEMENT</u>

PROMISOR does hereby agree and acknowledge as follows:

1.    PROMISOR agrees to accept the $15,000 policy limits of PROGRESSIVE for a Covenant Not to Execute as to PROMISEE. The sums to be received will resolve any and all claims that PROMISOR has, or may have, against PROMISEE arising out of the INCIDENT, THE

ACTION, and CIVIL ACTION.  It shall not release or in any way absolve PROMISOR'S claims against PROGRESSIVE.

2.    PROMISEE hereby irrevocably assigns to PROMISOR the proceeds, i.e., the money damages which he may recover and which he may be entitled to collect by way of settlement, award or judgment rendered in his favor and against PROGRESSIVE in any insurance bad faith action based upon breach of the implied covenant of good faith and fair dealing or any other similar action which might or could have been filed by PROMISEE against PROGRESSIVE arising out of personal over-limits exposure resulting from THE ACTION and seeking the same relief.

3.    The assignment of proceeds as set forth paragraph 2 immediately preceding shall not exceed the amount of any judgment, award or settlement rendered in favor of PROMISOR against PROMISEE in the action.  Such judgment shall include the principal amount together with recoverable costs and accrued interest thereon at the legal rate until actually paid or satisfied.

4.    To the extent that PROMISEE recovers damages, either compensatory or punitive, or both, against PROGRESSIVE in PROMISEE'S own insurance bad faith case based upon breach of the implied covenant of good faith and fair dealing, or in any similar action arising out of the same over-limits exposure subject matter in seeking the same relief, then to the extent that the total amount of such damages exceeds the amount of the bodily injury judgment in favor of PROMISOR against PROMISEE in the action as described in the immediately preceding paragraph, then such excess damages and the right to collect such excess damages shall be the sole property of PROMISEE.

5.    Upon the entry of judgment in favor of PROMISOR in the action, PROMISOR, as a judgment creditor, may petition for leave to file a Complaint in Intervention in any future insurance bad faith suit filed, if filed at all, by PROMISEE against PROGRESSIVE for bad faith breach of the

3

implied covenant of good faith and fair dealing and any similar related tort. PROMISEE hereby

agrees to stipulate to the filing of said Complaint in Intervention by PROMISOR. If PROMISEE

never files his own insurance bad faith case against PROGRESSIVE, this failure, it is agreed, will in

no way impair PROMISEE'S instant assignment to PROMISOR of PROMISEE'S right to recover

against PROGRESSIVE the entire bodily injury judgment achieved by PROMISOR against

PROMISEE as a result of PROGRESSIVE's breach of its contractual and extra contractual good

faith and fair dealing duties, including the good faith duties to settle and investigate all claims owed

by it to PROMISEE when handling PROMISOR'S claims against PROMISEE.

6.       In consideration of the mutual promises made herein, PROMISEE irrevocably agrees

that he has not and will not release any rights he has against PROGRESSIVE without the express

written consent of PROMISOR.

7.       PROMISOR reserves the unconditional right to settle with PROGRESSIVE at any time

under any terms and conditions and for any amount in his sole and exclusive discretion. In the event

of any such settlement between PROMISOR and PROGRESSIVE, PROMISOR shall notify

PROMISEE of such settlement and will thereupon file a full Satisfaction of Judgment in favor of

PROMISEE in the action.

8.       PROMISOR and PROMISEE understand that PROMISOR may pursue PROMISOR'S

case against other defendants in the CIVIL ACTION. This Covenant Not to Execute or Enforce

Judgment shall not affect PROMISOR'S ability to proceed against other defendants in the CIVIL

ACTION. PROMISOR and PROMISEE agree that since there are other defendants in the CIVIL

ACTION, in order for PROMISEE to be provided full protection from this Covenant, PROMISEE

must obtain a good faith settlement order from the court. Therefore, PROMISOR and PROMISEE

agree that this settlement and Covenant Not to Execute are conditioned upon PROMISEE being able

to obtain a good faith settlement order from the court.

9.    PROMISOR and PROMISEE agree that each party will be responsible for their own expenses, costs, and attorneys' fees as a result of the INCIDENT, and that PROMISOR shall not seek a cost recovery against PROMISEE at the conclusion of trial regardless of the outcome of the litigation.  Furthermore, PROMISEE agrees not pursue PROMISOR for costs regardless of the outcome of the litigation.

10.    PROMISEE agrees through his insurer, PROGRESSIVE, to provide PROMISEE a defense throughout the remainder of the litigation brought by PROMISOR arising out of the INCIDENT.

11.    PROMISOR and PROMISEE agree that this Covenant Not to Execute is an agreement signed between PROMISOR and PROMISEE.  By paying its $15,000 policy limits, PROGRESSIVE agrees that it is paying this amount to protect its insured through the Covenant Not to Execute.  Further, although PROGRESSIVE takes the position that it has not violated any duties or obligations to PROMISORS or PROMISEES, PROGRESSIVE shall not assert that the signing of this Covenant Not to Execute or Enforce Judgment precludes PROMISOR or PROMISEE from filing an action against PROGRESSIVE in the future.

12.    This is a full and complete Covenant Not to Execute or Enforce Judgment provided by PROMISOR to PROMISEE applying to all known, unknown, and unanticipated injuries or damages arising out of or in any way connected with or resulting from the INCIDENT.  PROMISOR understands that Civil Code §1542 generally applies to a general release, and to the extent possible under California law, PROMISOR expressly and intentionally waives all rights and benefits which PROMISOR now has or in the future may have for this Covenant Not to Execute or Enforce Judgment under the terms of §1542 of the Civil Code of the state of California, which latter section

provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

13.  This Covenant Not to Execute or Enforce Judgment contains the entire agreement between the parties hereto.  The terms of this agreement are contractual and not a mere recital.  This agreement is executed by PROMISOR without reliance upon any representation by PROMISEE concerning the nature and extent of PROMISOR'S damages or the legal liability therefore.  If any provision or portion of this agreement is held to be illegal or invalid by a court of competent jurisdiction, said provisions shall be deemed to be severed and deleted, and the remainder of this agreement shall continue to be valid and enforceable.

14.  PROMISOR and PROMISEE acknowledge they have been represented by legal counsel and have freely consented to the terms and conditions of this Covenant Not to Execute or Enforce Judgment, and that this agreement has not involved coercion, undue influence, or economic pressure.

15.  PROMISOR and PROMISEE agree to execute and deliver such additional documents and do all acts necessary as may be reasonably required to carry out the effect and intent of this agreement.

16.  PROMISOR and PROMISEE acknowledge that they have read and understand each and every portion of this agreement, and by placing their signature at the end of this agreement, represent that they have voluntarily assumed the obligations contained herein and intentionally waive all the rights stated herein, of their own free will.

17.  This agreement can be signed in counter parts, such that the original signatures can be

6

**17**
**Exh. 1**

signed at different times and locations and be forwarded back to the law firm of Winet, Patrick & Weaver and assimilated into one original document. Once the agreement is assimilated with all original signatures, that document shall become the original, whether or not said original signatures occurred at different times, dates, and locations.

### IV.

### EXECUTION BY PROMISOR, PROMISEE, PROGRESSIVE AND COUNSEL

Dated: _____          _____
                                Authorized Representative of PROMISOR

Dated: _____          _____
                                PROMISEE

Dated: _____          _____
                                Authorized Representative of PROGRESSIVE

**APPROVED AS TO FORM AND CONTENT:**

**ANGELO & DI MONDA**

Dated: _____          By:_____
                                Christopher E. Angelo
                                Attorney for Bun Bun Tran

**WINET, PATRICK & WEAVER**

Dated: _____          By:_____
                                Randall L. Winet
                                Attorney for Leonel Arrellano

Dated: _____          _____
                                Counsel for Progressive Insurance Company

7

**Westlaw Delivery Summary Report for** ████████████████

| | |
|---|---|
| Your Search: | ra(val2 val3 val4 val5 val6 val7 val8 val9) & to,su,inj,te("BAD FAITH" AND AUTOMOBILE) |
| Date/Time of Request: | Wednesday, May 21, 2008 11:42 Central |
| Client Identifier: | PROGRESSIVE V. TRAN |
| Database: | CA-JV |
| Citation Text: | 40 Trials Digest 8th 8 |
| Lines: | 115 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



40 Trials Digest 8th 8                                                                    Page 1

40 Trials Digest 8th 8 (Cal.Superior), 2005 WL 2428695

Copyright (c) 2008 Thomson/West

Superior Court, Tulare County, California.

Chastain vs. Leader Insurance

TOPIC:
Synopsis: Injured motorist sues responsible party's carrier for **bad faith** refusal
to settle
Case Type: Insurance; Third Party Coverage; **Automobile** Policy; Insurance; **Bad
Faith**; Duty to Settle

DOCKET NUMBER: 03207642

STATE: California
COUNTY: Tulare

Verdict/Judgment Date: 3/8/2005

JUDGE: Joseph A. Kalashian

ATTORNEYS:

Plaintiff: Rene Turner Sample , Cornwell & Sample, Fresno.
Defendant: Peter Godfrey , Gilbert, Kelly, Crowley & Jennett, Los Angeles.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $670,000

Range: $500,000-$999,999

   The stipulated judgment of $670,000 was entered on June 18, 2003, and
post-stipulated judgment interest at the time of the verdict was $116,378.
Therefore, the parties stipulated that, if the jury found **bad faith**, the damages
were $786,378. Final judgment, including costs and expert fees, was $836,231.
Trial Type: Jury
Trial Length: 6 days.
Deliberations: 25 minutes.
Jury Poll: 12-0.

EXPERTS:
Plaintiff: Boyd A. Veenstra , insurance claims adjuster, Veenstra & Associates,
Burbank, (818) 955-9991.
Defendant: Ken Oswald , insurance claims expert, Equity Claim Management, Aliso
Viejo, (949) 330-7862.; Steven V. Phillipi , attorney, Phillipi & Nutt, Pasadena.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: On March 12, 2000, Victor Enriquez caused a three-car
collision, seriously injuring plaintiff Julius Chastain Sr., a 78-year-old retired
plumber. At the time of the accident, Enriquez was the permissive user of a vehicle
owned by his girlfriend, Susan Castillo. Castillo's vehicle was insured with a
15/30 policy through Leader Insurance (currently known as Leader/Infinity Insurance
Group). There were four people making claims for injuries arising out of this
accident, and it was immediately determined by Leader that the value of their
claims 'clearly exceeded' the policy limits. The adjuster assigned to the file was
from a temporary employment agency, had no meaningful experience in California
files, and admitted that this was the most complicated file he had ever worked on.
On November 21, 2001, plaintiff's attorney sent Leader a 30-day timed limit demand
letter enclosing copies of medical records documenting plaintiff's injuries and
offering to release the insureds for the $15,000 policy limits. At the time the
timed policy limit demand was received, Leader was aware of the following regarding
the four claimants: (1) Claimant No. 1 (Chastain) spent over one month in ICU with
several surgeries and over three months in a rehabilitation hospital, with medical
bills of $258,197; (2) Claimant No. 2 broke his ankle and had $24,984 in medical
bills and $24,000 in lost wages; (3) Claimant No. 3 had soft tissue injuries and
had stopped treating within five months; (4) Claimant No. 4, a minor, who was
Enriquez's nephew, had been checked by the paramedics at the scene with complaints

of a sore arm, but received no other treatment.

Leader never notified Enriquez of the extent of the injuries or damages claimed by any of the claimants, and never notified him of plaintiff's policy limit demand. Leader admitted that the value of plaintiff's case significantly exceeded the value of the other three claimants involved, and Enriquez testified that, if he had been consulted, he would have instructed Leader to settle with plaintiff.

Less than two months before the statute of limitations was going to expire on December 19, 2000, the temporary adjuster wrote the following to all of the claimants: 'At this time we stand ready and willing to pay those limits but will need your help to reach a resolution. At this time we are calling on you and the other parties involved to reach a consensus on how you would like to divide the bodily injury policy limits of our insured's policy, which are $15,000 per person up to a maximum of $30,000 per accident. Please contact our office once an agreement of common consent has been reached.' The adjuster sent this letter to all of the claimants, two of whom were unrepresented, without providing any information to them regarding how to contact the other claimants or the extent of the injuries being claimed by any of the other claimants.

In response to the rejection of his demand for one leg of the policy, plaintiff filed suit against Enriquez, took depositions, and hired an expert in preparation for trial. In September 2001, Leader finally offered its $15,000 to plaintiff, but he refused the offer. Shortly before trial, Leader approached plaintiff's counsel, and, in exchange for a covenant not to execute, negotiated a stipulated judgment in the amount of $670,000. Leader consented to a stipulated judgment and the assignment of Enriquez's rights to pursue his **bad faith** cause of action for economic losses to plaintiff. Enriquez never filed an action to pursue his non-economic losses.

Plaintiff argued that Leader's December 19, 2001 response was an unreasonable failure to accept a reasonable settlement demand within the insured's policy limits (CACI 2334), and that it was Leader's **bad faith** conduct that lost Enriquez's window of opportunity to settle plaintiff's case within his policy limits.

Leader claimed that its December 19, 2001 response was 'reasonable' because it was their duty to attend to all of the claims. Plaintiff's experts testified that it was Enriquez's debt, and, therefore, should have been Enriquez's decision whether or not to accept plaintiff's policy limit demand. Leader also claimed that plaintiff's demand was not 'reasonable' because it did not specifically mention Enriquez by name, but the evidence showed that the adjuster never raised that issue when the demand was received. Plaintiff's expert testified that the insurance company is obligated to notify its insured of any policy limit demand and seek clarification if the demand is deemed unclear.


CLAIMED INJURIES
NA


CLAIMED DAMAGES
According to Plaintiff: Not reported.


SETTLEMENT DISCUSSIONS
According to Plaintiff: Plaintiff served a CCP § 998 for $669,000, which was

rejected. Shortly before trial, plaintiff had reduced his demand to $570,000.
Defendant never made a formal offer above $30,000, but did suggest a willingness to
settle for something slightly above $100,000.

COMMENTS
According to Plaintiff: While pursuing the **bad faith** action, plaintiff died, and
the action was continued by his surviving four sons. There were no post-trial
motions, and the judgment has been paid in full.

Trials Digest, A Thomson/West business

Tulare County Superior Court

40 Trials Digest 8th 8 (Cal.Superior), 2005 WL 2428695

END OF DOCUMENT
        © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5/21/2008 9:45 AM

2002 WL 32136792 (Cal.Superior), 29 Trials Digest 6th 3
For opinion see 2003 WL 25333590 (Trial Order), 2002 WL 34113900 (Trial Order), 2001 WL 36022449
(Trial Order)


**Motions, Pleadings and Filings**

Copyright (c) 2008 Thomson/West

Superior Court, Los Angeles County, California.

Thomas vs. Workmen's Auto Insurance Company

TOPIC:
Synopsis: Insured sues carrier for **bad faith** handling of claim against him
Case Type: Insurance; **Bad Faith**; Duty to Settle

DOCKET NUMBER: BC252986

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: December 23, 2002

JUDGE: Irving S. Feffer

ATTORNEYS:
Plaintiff: Katherine B. Pene, Briskin, Latzanich & Pene LLP, Sherman Oaks.
Defendant: Glenn S. Goldby, Declues & Burkett, LLP, Santa Ana.; Patricia Lynch, Declues & Burkett,
Santa Ana.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $350,000

Range: $200,000-$499,999

Plus attorney fees, costs, and interest for a total judgment of $540,313.
Trial Type: Jury
Trial Length: 13 days.
Deliberations: 6 hours.
Jury Poll: 12-0.

EXPERTS:
Plaintiff: Thomas L. Carter, insurance claims consultant, Murrieta, (909) 696-7850.; George Finder,
credit evaluator, Fullerton, (714) 441-0900.; William Josephs, psychologist, Sherman Oaks, (818)
783-9930.; Marvin Pietruszka, family practitioner/internist/pathologist, Reseda, (818) 705-1157.; Jerry
A. Ramsey, attorney/insurance claims, Engstrom, Lipscomb & Lack, Los Angeles, (310) 552-3800.
Defendant: Boyd A. Veenstra, insurance claims adjuster, Veenstra & Associates, Burbank, (818)
955-9991.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS
According to Plaintiff: The defendant in a lawsuit arising out of an **automobile** accident sued his
insurance carrier for **bad faith** handling of his defense. The plaintiff was Meddie Thomas, a 78-year-old
retiree. The defendant was Workmen's Auto Insurance Company. The accident in the underlying case
occurred on March 19, 1999. Michele Luster, the plaintiff in the underlying case, was seriously injured,

sustaining a <u>fractured knee</u>, requiring surgery. While there was some dispute as to liability, Meddie Thomas indicated that he was distracted by a sound and not looking as he entered the intersection. His policy limits with Workmen's, with whom he had been insured for eight years, were only $15,000. When Luster became frustrated trying to obtain the policy limits from Workmen's, she retained attorney Ronald Marks to assist her. He spoke with Workmen's adjuster and sent her an authorization and proof of insurance on June 25, 1999, indicating that it was a policy limits case. On July 23, 1999, Luster, through her attorneys, offered to settle her claim in the underlying personal injury case against plaintiff for the policy limits of $15,000. On August 9, 1999, Luster again wrote to Workmen's, offering to settle for the policy limits, and giving Workmen's 10 days to accept the offer or it would be permanently withdrawn. Another letter was sent by fax and mail on August 16, 1999, reminding Workmen's that the offer was about to expire. Workmen's, however, failed to inform plaintiff of the settlement offer and failed to settle the claim for the policy limits before the offer expired on August 19, 1999. Later, long after the policy limits demand expired, Workmen's tried to offer the policy limits but was rejected. Workmen's never advised plaintiff of the settlement attempts or the failure to settle within the policy limits. Shortly before the trial in the underlying case, the attorneys hired by Workmen's advised plaintiff to get another attorney, since they could not represent him after the trial was over. The Luster v. Thomas case was tried in December 2000, with a verdict of $240,000 entered on December 22, 2000. Workmen's paid $15,000, leaving Thomas with a judgment against him of $225,000.
Workmen's never made any offer in excess of $15,000 and refused to consider any settlement above that amount. Shortly before trial, Workmen's finally offered $1,501 to settle the case, even though the judgment had grown with the interest accumulating at 10 percent per annum. At trial, the court excluded all evidence of Workmen's **bad faith** tactics in other cases, and the jury therefore was misled into believing that this was a one-time occurrence. In addition, the jury misunderstood the punitive damages instructions, believing that intent to injure was required. Therefore, no basis for punitive damages was found. The jury returned a verdict of $272,250 for the breach of contract action to satisfy the underlying judgment against plaintiff and $77,750 in compensatory damages. The claim for attorney fees and costs had been severed before trial and was tried to the judge after the verdict. Attorney fees of $147,721 and costs of $37,819 were awarded by the court to plaintiff.

CLAIMED INJURIES
According to Plaintiff: Emotional distress, leading to physical illness and two hospitalizations for stroke/stress.

CLAIMED DAMAGES
According to Plaintiff: $19,200 past medical; $29,000 loss of credit (refinanced home at excessive rate due to judgment).

SETTLEMENT DISCUSSIONS
According to Plaintiff: Demand: $599,999. Offer: $1,501.

EXPERT TESTIMONY
According to Plaintiff: Plaintiff's expert Ramsey testified re **bad faith**.

COMMENTS
According to Plaintiff: Plaintiff's expert Carter acted as a consultant only and did not testify. The judgment has been satisfied.

Trials Digest, A Thomson/West business
Los Angeles County Superior Court/Downtown

2002 WL 32136792 (Cal.Superior), 29 Trials Digest 6th 3

### Motions, Pleadings and Filings (Back to top)

• 2002 WL 32934774 (Expert Report and Affidavit) Declaration of Jerry A. Ramsey in Support of the Opposition to Defendant's Motion for Summary Judgment or Summary Adjudication (Nov. 14, 2002)
• 2002 WL 32787657 (Trial Motion, Memorandum and Affidavit) Reply to the Opposition to Motion for Order Compelling for the Responses to Discovery Request and for Reward of Sanctions (Nov. 8, 2002)

- 2002 WL 32788488 (Trial Motion, Memorandum and Affidavit) Reply to Opposition to Motion for Summary Judgment, or in the Alternative, for Summary Adjudication of Issues; Declaration of Cary K. Quan (Nov. 8, 2002)
- 2002 WL 32788483 (Trial Motion, Memorandum and Affidavit) Defendants' Kurt Boyd and Boyd & Ericksen's Response to Plaintiff's Objection to Portions of the Blitstien Declaration Submitted in Opposition to Plaintiff's Motion for Protective Order (Sep. 26, 2002)
- 2002 WL 32788480 (Trial Motion, Memorandum and Affidavit) Reply to Opposition to Motion for Protective Order and for Award of Monetary Sanctions (Sep. 25, 2002)
- 2002 WL 32788477 (Trial Motion, Memorandum and Affidavit) Reply to Opposition to Motion for A Protective Order; Declaration of Katherine B. Pene (Sep. 20, 2002)
- 2002 WL 32788484 (Trial Motion, Memorandum and Affidavit) Defendants Boyd & Ericksen & Kurt Boyd's Reply to Plaintiff's Opposition to Motion to Compel Further Responses to Special Interrogatories and Request for Monetary Sanctions (Jul. 19, 2002)
- 2002 WL 32788476 (Trial Motion, Memorandum and Affidavit) Separate Statement of Discovery Requests and Responses in Dispute Filed in Support of Defendant's Motion to Compel Further Responses to Special Interrogatories (Set Two) and for Monetary Sanctions (Filed Concurrently with Motion to Compel) (Jun. 26, 2002)
- 2002 WL 32788486 (Trial Motion, Memorandum and Affidavit) Defendant Ericksen's Reply to Plaintiff's Opposition to Demurrer (Mar. 1, 2002)
- 2002 WL 34118312 (Trial Motion, Memorandum and Affidavit) Opposition to Demurrer of Defendant Erickson (Feb. 27, 2002)
- 2002 WL 34118311 (Trial Motion, Memorandum and Affidavit) Defendant Ericksen's Notice of Demurrer and Demurrer to Plaintiff's Complaint; Request for Judicial Notice/Declaration of Lori S. Blistien (Jan. 11, 2002)
- 2001 WL 34740295 (Trial Pleading) Answer to Complaint (Dec. 28, 2001)
- 2001 WL 34743434 (Trial Pleading) Amendment to Complaint Sec. 474 C.C.P. (Nov. 26, 2001)
- 2001 WL 34743431 (Trial Pleading) Answer of Defendants Kurt Boyd and Boyd & Ericksen to Unverified Complaint (Oct. 5, 2001)
- 2001 WL 34743429 (Trial Motion, Memorandum and Affidavit) Defendant Boyd & Ericksen's Reply to Opposition to Motion to Strike (Sep. 21, 2001)
- 2001 WL 36029518 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Motion to Strike Plaintiff's Complaint and Memorandum of Points and Authorities (Sep. 17, 2001)
- 2001 WL 36029517 (Trial Motion, Memorandum and Affidavit) Defendants' Notice of Motion and Motion to Strike Plaintiffs' Claim for Emotional Distress Damages, Damages to Reputation, and Attorneys Fees; Memorandum of Points and Authorities (Aug. 22, 2001)
- 2001 WL 34743426 (Trial Pleading) Answer to Complaint (Aug. 15, 2001)
- 2001 WL 34743424 (Trial Pleading) Complaint for Compensatory and Exemplary Damages for Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; Breach of Statutory Duty (Insurance Code | 790.3(h) and for Legal Malpractice (Jun. 25, 2001)
- BC252986 (Docket) (Jun. 25, 2001)

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**LexisNexis**® *Total Research System*    ☐ Switch Client | Preferences | Sign Off | ❓ Help

☐ Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ℹ️
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

✔ Select for FOCUS™ or Delivery
☐

© 1999 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

Copyright 1999 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

P. J. ZIMMERMAN FOR THE BANKRUPTCY ESTATE OF MERVIN KERSLAKE, ET AL. VS. FARMERS INSURANCE EXCHANGE, ET AL.

Case No. BC 193 736

**Verdict Date:** September 7, 1999;

**Publication Date:** December, 1999

**Topic:** INSURANCE **BAD FAITH** - FAILURE TO ACCEPT POLICY LIMITS DEMAND - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING IN ENCOURAGING INSURED TO FILE FOR BANKRUPTCY

**Result:** $ 850,000 Recovery

**State:** California

**County:** Los Angeles County

**Judge:** Judge Kurt J. Lewin

**Plaintiff Attorney:** Michael H. Whitehill of Kussman & Whitehill in Los Angeles, Ca.

**Defendant Attorney:** Alan Michael and Daniel L. Gardner of Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone in Marina Del Rey, Ca.

**Facts:** This insurance **bad faith** action arose out of the defendant insurance company's alleged failure to accept the plaintiff's policy limits demand following an underlying **automobile** accident allegedly caused by its insured. The plaintiff contended that the defendant breached the covenant of good faith and fair dealing owed to its insured in failing to accept the plaintiff's offer of the policy limits and by encouraging its insured to file for bankruptcy.

On March 6, 1996, the 82-year-old male insured, while operating an **automobile,** ran over and fatally injured a 22-year-old male marine. The accident occurred in Twenty-Nine Palms, California. Six weeks after the accident, the defendant insurance company unconditionally offered its insured's policy limits to the marine's widow, Amy Collins. After receiving the defendant's offer, Amy Collins and her counsel undertook an extensive asset search on the insured motorist, only to find that he had no significant assets. Thus, on July 15, 1996, Mrs. Collins' counsel forwarded a letter to Farmers stating that Mrs. Collins would accept the insured's $ 15,000 policy limits in return for a complete release as long as payment was made by August 1, 1996.

The defendant insurer received the demand on July 18, 1996. On July 22, a claims

Case 3:07-cv-01999-JAH-POR        Document 17-2      Filed 05/29/2008      Page 3 of 3

representative for Farmers wrote to Mrs. Collins' counsel indicating that Farmers investigation was continuing on the heir issue and that Farmers was requesting a written guarantee from Mrs. Collins' counsel that should any heir come forward, counsel would be responsible for payment to those heirs. Farmers did not forward the $ 15,000 policy limits by August 1, 1996.

On August 5, 1996, Farmers abandoned its request for a written guarantee from Mrs. Collins' counsel regarding heirs, but placed a new condition on settlement production of a death certificate. On August 20, 1996, Mrs. Collins forwarded the death certificate, but indicated that Farmers' $ 15,000 policy limits offer was being rejected.

A lawsuit was filed and, five days prior to the scheduled trial date, the insured motorist declared bankruptcy. The insured's potential **bad faith** claim against Farmers was eventually declared an asset of the bankruptcy estate. The Bankruptcy Court lifted the stay allowing the case to proceed to trial and assigned the insured's trustee all of the insured's rights to prosecute a **bad faith** action against Farmers. On April 22, 1998, a jury returned a verdict in favor of Mrs. Collins and against Farmers' insured for $ 750,000. Farmers paid $ 15,000, but refused to pay the remainder of the judgment and this lawsuit ended. The action was prosecuted by the insured's trustee in bankruptcy.

The plaintiff contended that Farmers breached the covenant of good faith and fair dealing owed to the insured in failing to accept plaintiff's July 15, 1996, settlement demand, which was reasonable. The plaintiff also contended that the defendant breached the covenant of good faith and fair dealing in persuading the insured to declare bankruptcy and in paying for his bankruptcy attorney in an attempt to discourage Mrs. Collins from obtaining a judgment against the insured.

The defendants contended that all of their actions were reasonable and undertaken in good faith. They offered the policy limits within six (6) weeks of the date of the accident. The defendants argued that Mrs. Collins' July 15, 1996, demand was an attempt to "set up" Farmers for a **bad faith** action. Farmers offered to pay the policy limits five (5) days after the demand expired, according to the defendant's claims. The defendant also asserted that the insureds decision to declare bankruptcy was his own and based upon advice of independent counsel.

The plaintiff claimed damages as follows: $ 750,000 owed by the insured on the underlying case; interest on the underlying judgment; as well as a potential punitive damages claim on behalf of the estate against Farmers.

There were no settlement discussions between the parties until an all-day Voluntary Settlement Conference was held in front of the Honorable Howard B. Weiner, Justice Retired, at which time the case settled. The parties agreed to a settlement figure of $ 850,000.

**Commentary:** The defendant faced a difficult task in justifying its failure to make a timely and reasonable offer of settlement in light of the clear evidence of liability on the part of its insured and the fact that the pedestrian was fatally injured, which arguably simplified valuation of the case. Up until settlement, the defendant's focus was on the minimal length of time (five days) between the plaintiff's settlement demand time limit and the date at which the defendant agreed to pay the policy limits. The plaintiff was prepared to counter that a time limit is just that, and that the defendant had ample time within the allotted time limit to evaluate and assess liability and damages in the case. The defendant's willingness to settle, rather than risk trial and a potential **bad faith** award in the millions, was likely attributable to the difficulty it would face in justifying the delay in offering the policy limits and, perhaps, an acceptance of the likelihood that in an insurance liability case, jurors are very often inclined to give the plaintiff the benefit of the doubt over the impersonal insurance company.

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ⓘ

**27**
Exh. 4

LexisNexis® *Total Research System*

☐ Switch Client | Preferences | Sign Off | ❓ Help

☐ Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > California Jury
Verdicts, Combined ⓘ
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

© 1992 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

Copyright 1992 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

MARIANNA MONZANO, ET AL. vs. FARMERS INSURANCE EXCHANGE

Case No. C 535345

**Publication Date:** Publication Date: April, 1992

**Topic:** Insurance **bad faith** - Plaintiffs bring suit against defendant insurance company alleging **bad faith** refusal to settle first part uninsured motorist claim where liability was not reasonably in dispute - Financial hardship suffered by plaintiffs as a result of the delay - Thousands of dollars spent in attorneys fees - Emotional distress

**Result:** $ 16,475,000 verdict

**State:** California

**County:** Los Angeles County

**Judge:** Judge Judith Chirlin

**Plaintiff Attorney:** Michael J. Piuze of the Law Offices of Michael J. Piuze in L.A.

**Defendant Attorney:** James Braze of Waldman, Graham & Chuang in L.A.

**Facts:** The plaintiffs in this action were the wife and five (of six) adult children of the decedent, who was insured by the defendant Farmers Insurance at the time he suffered fatal injuries in an **automobile** accident. The plaintiffs contended that the defendant insurer acted in **bad faith** by refusing to settle the plaintiffs' first-party insurance claim when liability became reasonably clear. The plaintiffs claimed damages for the financial hardship they endured as a result of the defendant's failure to timely pay their claim and for emotional distress. The underlying **automobile** accident occurred in September of 1981. The decedent was a passenger in his own vehicle, which was driven by an uninsured driver operating the car while under the influence of alcohol. The decedent's **automobile** collided with three parked cars and the decedent was fatally injured in the accident. The evidence indicated that at the time of the accident, the decedent's wife and disabled dependent daughter resided in Ecuador, as did other of his adult children. Two adult children lived in the United States. The plaintiffs made a claim for the $ 15,000 uninsured motorist policy limits in May of 1982. Farmers delayed payment until August of 1984. No demand for arbitration was ever filed. The defendant denied that payment was delayed in **bad faith,** alleging that the plaintiffs, to recover under the policy, were required to submit proof that they were dependents of the insured. The defendant argued that since, at the time of the accident, the decedent and the plaintiffs resided separately, with the decedent living in the United States and the plaintiffs living in Ecuador, the plaintiffs had the burden of providing the defendant with sufficient information proving that the plaintiffs were being supported by the decedent at the time of his death so as to render them eligible to recover

under the policy. The defendant contended that in its investigation which followed the plaintiffs' submission of the policy claim, the defendant reasonably requested documentation from Ecuador to establish that the decedent was, in fact, supporting the plaintiffs at the time of the accident. The defendant maintained that the attorney who represented the plaintiffs with respect to the underlying action failed to provide the defendant with sufficient information in this regard. The plaintiffs countered that the defendant was provided with sufficient information from it could reasonably determine that the plaintiffs were financially dependent upon the decedent at the time of his death. The plaintiffs called their prior attorney, who initially processed the policy claim, to testify as to what information was provided to the defendant. This witness related that the claim was properly submitted to the defendant and that all requests by the defendant to facilitate processing of the claim were reasonably met by the plaintiffs. The attorney testified that he provided the defendants with a declaration specifically stating that the decedent was, in fact, providing support to his family in Ecuador at the time of his death. The defendant countered that the attorney who handled the uninsured motorist claim failed to provide the defendant with adequate verification of support and that the declaration referred to by the prior lawyer was not sufficiently specific, stating only that support was provided to the family by the decedent, but failing to include specific information regarding how much support was being given. The defendant further argued that arbitration should have been demanded by the plaintiffs' if they had wished to resolve the matter more quickly. The plaintiff's insurance claims expert testified, based upon his review of the information provided to the defendant following submission of the policy claim by the plaintiffs, that the defendant had no reasonable basis upon which to delay payment of the claim. The defendant's in-house expert countered that the defendant acted reasonably in demanding specific proof establishing that the plaintiffs and the decedent were indeed functioning together financially as a family unit. The damages evidence consisted of testimony from the plaintiffs themselves who explained the financial hardships endured in the years which followed the decedent's death as a result of the defendant's failure to timely settle the claim. The testimony established that they were forced to perform sewing in the home to earn money to eat. In addition, they were forced to uproot themselves for an extensive period of time, having to leave Ecuador and come to the United States to fight their claim. The plaintiffs also testified as to the emotional stress suffered as a direct result of the defendant's refusal to pay the claim. The plaintiffs claim for punitive damages based upon the evidence arguable indicating **bad faith** on the part of the defendant in delaying payment of the claim was supported by evidence of the defendant's net worth. There was a stipulation by counsel that the defendant's net worth was $ 1.5 billion. The jury found for the plaintiff's and returned a verdict of $ 16,475,000 including $ 15,000,000 in punitive damages(the equivalent of 1% of the defendant's stipulated net worth). The case is presently on appeal.

**Plaintiff Experts:** Plaintiff's insurance claims expert: Don Hall of Whittier, Ca.

**Defendant Experts:** Defendant's in-house expert: Gary Brann

**Commentary:** This was a "Fast Track" case, expedited for trial due to the particular circumstances faced by the plaintiffs, originally scheduled for trial in October of 1989. In October of 1989, however, the presiding "Fast Track" Judge did not have a courtroom available until two and one half months later. The trial then proceeded, lasting five weeks. On the last day of testimony, the Judge granted a mistrial. The case was retried in early 1991, lasting five weeks. The plaintiffs were effectively uprooted from their home in Ecuador from October of 1989 until March of 1991, adding to the inconvenience and hardship initiated by the defendant in its mishandling of their policy claim. The decedent was killed in 1981 and his family, the plaintiffs, are still in litigation in 1992. It is expected that the appellate process will in all likelihood continue until the end of 1993, at which time the plaintiffs will have lived with this conflict for 13 years. Counsel for plaintiff, who has handled a significant number of insurance **bad faith** cases, relates that the lengthy procedural ordeal through which these plaintiffs have persevered is not uncommon in insurance **bad faith** cases.

**Issue:** Published in Volume 7, Issue 5

**LexisNexis**® *Total Research System*    ☐ Switch Client | Preferences | Sign Off | 🔲 Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** 🔟
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

© 1992 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

Copyright 1992 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

LINDEN MAURICE KNIGHTEN, ET AL. vs. INTERINSURANCE EXCHANGE OF THE **AUTOMOBILE** CLUB OF SOUTHERN CALIFORNIA

Case No. 56 25 49

**Verdict Date:** Verdict Date: June 8, 1992;

**Publication Date:** Publication Date: October, 1992

**Topic:** Insurance **bad faith** - Failure of defendant insurer to offer settlement when liability of insured reasonably clear - Following settlement of underlying case with insured, plaintiff receives assignment of insured's rights to file **bad faith** cause of action against defendant

**Result:** $ 1,300,000 recovery

**Title:** Insurance Liability; **Bad Faith**

**State:** California

**County:** Orange County

**Plaintiff Attorney:** Wylie A. Aitken and Richard A. Cohn of the Law Offices of Wylie A. Aitken in Santa Ana, Ca.

**Defendant Attorney:** William D. Jennett and Michael Mercy of Gilbert, Kelly, Crowley & Jennett in L.A.

**Plaintiff Cause:** This insurance **bad faith** action arose out of an **automobile**/pedestrian accident caused by the negligence of the insured. The plaintiff contended that although the liability of the insured was reasonably clear, the defendant insurance company failed to timely tender a settlement offer. Following plaintiff's receipt of $ 200,000 from the insured's personal assets and an assignment of the insured's cause of action for **bad faith** against the defendant insurance company, the plaintiff filed the subject action.

The underlying accident occurred on Pacific Coast Highway near the Cano's Restaurant in the City of Newport Beach, California. The defendant in the underlying accident, the insured, was intoxicated and operating a Mercedes Benz **automobile,** leaving the parking lot of Cano's Restaurant. The plaintiffs were pedestrians across the street on Pacific Coast Highway. The plaintiffs were struck by the insured's vehicle when she drove across the highway and onto the sidewalk. The insured then fled the scene of the accident.

During settlement negotiations, the defendant insurance company failed to accept settlement demands for the policy limits which would have resolved the case against the insureds, despite

that liability was clear and damages exceeded the policy value. As such plaintiff's demanded and received $ 200,000 from the insureds' personal assets and assignment of the insured's right to pursue and **bad faith** claim against the defendant. The plaintiffs also recovered the $ 200,000 policy limits. The plaintiffs then entered into a stipulated judgment in the sum of $ 2,400,000 against the insureds and proceeded against the insurance company on their own third-party **bad faith** cause of action as well as the assigned first-party cause of action. The 43-year-old male plaintiff suffered the following injuries in the underlying accident: a cerebral concussion, a fracture of the interconylar eminence of the left knee, a medical collateral ligament tear, phlebitis of the left leg, multiple fractures on his left side, fractured ribs, facial abrasions and scalp contusions.

This plaintiff suffered a permanent shortening of the left leg, numerous facial scars and has developed traumatic arthritis from his left knee to the thigh. The 40-year-old female plaintiff suffered the following injuries: multiple contusions and abrasions as well as ligament damage in her left side and pelvic area, as well as an enlarged uterus; a deep vein thrombosis of the left leg and all of the toes on her left foot were fractured; a dislocated left shoulder and whiplash injury to her neck; a pulmonary embolism; injury to discs at C5-C6, a neural Foraminal Narrowing at C6-C7 and extreme nerve irritation at C7-C8. Permanent injuries suffered by this plaintiff include degenerative disc disease at C5-C6 and thrombolembolic disease.

**Defendant Contentions:** The defendant insurance company denied acting in **bad faith,** maintaining that no demand within the policy limits was made such that there was any opportunity to extricate the insureds from the lawsuit. The defendant further asserted that the stipulated judgment was not a "final judicial determination of liability" as required by the applicable Moradi-Shalal case. The defendant alleged that the stipulated judgment was collusive and inflated, and, therefore, neither valid nor binding upon the insurance company. After receiving $ 200,000 from the insureds' personal assets and the $ 200,000 policy limits, and entering into a $ 2,400,00 million stipulated judgment, the plaintiffs made C.C.P. Sec. 998 demands of $ 250,000 and $ 200,000 upon filing of their **bad faith** complaint. Upon expiration of the statutory demands, the plaintiff's demand then increased to $ 500,000 per plaintiff ($ 1 million). The plaintiffs then decreased the demand to $ 950,000 and then $ 900,000 which the defendant accepted on May 13, 1992. The plaintiff's total recovery amounted to $ 1,300,000 including $ 200,000 insurance policy limits; $ 200,000 from the underlying defendants(insureds) personally; $ 900,000 from the defendant insurance company on the **bad faith** claim.

**Issue:** Published in Volume 7, Issue 11

Source:  Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** [i]
Terms:  **BAD FAITH AND AUTOMOBILE**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, May 21, 2008 - 1:06 PM EDT

 LexisNexis®

About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**31**
**Exh. 6**

LexisNexis® *Total Research System*

■ Switch Client | Preferences | Sign Off | ? Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ⓘ

Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

*© 1992 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis*

Copyright 1992 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

LEHTO vs. ALLSTATE INSURANCE COMPANY

Case No. C682570

**Verdict Date:** Verdict Date: August 30, 1991;

**Publication Date:** Publication Date: January, 1992

**Topic:** Insurer **bad faith** claim brought by assignee of insured's rights - Breach of Insurance Code - Failure to settle **automobile** claim on behalf of insured once liability became reasonably clear - No instruction on punitive damages given to jury

**Result:** $ 3,500,000 compensatory verdict

**State:** California

**County:** Los Angeles County

**Judge:** Judge Lillian M. Stevens

**Plaintiff Attorney:** Christopher E. Angelo of Mazursky, Schwartz & Angelo in L.A.

**Defendant Attorney:** Gregory MacGregor III and Deborah Berthel of Ervin, Cohen & Jessup in Beverly Hills

**Facts:** This was an action brought by a male plaintiff who suffered a paraplegic injury in an **automobile** accident while riding as a passenger in a car operated by his friend. The host vehicle was struck by a drunk driver who was operating a vehicle owned by his father with his father's permission. The plaintiff brought this action as assignee of the rights of the defendant Allstate's insured, the owner of the vehicle, following lengthy litigation brought by the plaintiff against the drunk driver and the vehicle owner. The plaintiff contended that the defendant Allstate, the vehicle owner's insured, acted in **bad faith** in the handling of the underlying claim and further, violated Insurance Code Sec. 790.03(h)(5) in its failure to promptly, fairly and equitably settle the plaintiff's underlying claims against the vehicle owner for negligent entrustment once liability became reasonably clear. The plaintiff sought to recover from the defendant Allstate the $ 2,500,000 stipulated judgment entered against the defendant vehicle owner as a negligent entrustor and further claimed damages for emotional distress. The subject accident occurred on May 18, 1980, when the car in which the plaintiff was riding was struck by a vehicle being operated by a drunk driver. The owner of the vehicle operated by the drunk driver had purchased an **automobile** liability insurance policy from the defendant Allstate Insurance Company with policy limits of $ 25,000 per person and $ 50,000 per occurrence, that was in effect at the time of the plaintiff's catastrophic injury. Allstate was notified of the accident on the following day and immediately opened a claims file and

conducted an investigation. By July 2, 1980, approximately two weeks after the accident, Allstate knew: (1) that six claimants in all were submitting personal injury claims against the drunk driver, four of whom were passengers in his vehicle with the other two claimants being the plaintiff and his driver; (2) that the plaintiff was the only catastrophically injured claimant; (3) that $ 25,000 was apportioned in varying amounts of reserves to be offered to the five claimants individually, while the remaining $ 25,000 was reserved solely for the plaintiff. On July 11, 1980, approximately three weeks after the subject accident, Allstate interpleaded into court, under C.C.P. Sec. 386, its entire policy indemnity limits of $ 50,000, thereby giving up its entire control over the policy proceeds and forcing the claimants to litigate against each other. In addition, Allstate requested reimbursement from the interpleaded funds of its attorneys' fees as authorized under C.C.P. Sec. 386 despite the fact that Allstate's liability insurance policy charged a premium to be exclusively responsible for costs and attorneys' fees incurred in defending the policyholder. Allstate's defense obligation was separate and apart from its indemnity obligation. The plaintiff contended that while charging a premium for defense costs and attorneys' fees, Allstate sought to avoid defense costs and fees by seeking interpleader and then requesting reimbursement for costs and attorneys' fees from the interpleaded indemnity limits. Allstate never provided the interpleader court with a copy of its liability insurance policy. The evidence indicated that the defendant Allstate hired one of its approved defense firms, Hiestand & Brandt, to file the interpleader action on July 11, 1980. At no time before July 11, 1980, did Allstate advise the named insured vehicle owner that he had a limited liability of up to only $ 15,000 under Vehicle Code Sec. 17151 unless negligent entrustment could be established against the vehicle owner. Despite the law of Vehicle Code Sec.17151, Allstate never offered any amount of money up to $ 15,000 to any claimant for a release of all claims as against the vehicle owner alone. On October 3, 1980, the plaintiff filed and served a personal injury lawsuit against the drunk driver for negligence and against the vehicle owner/insured for negligent entrustment. After reviewing that lawsuit, Allstate again failed to advise both the drunk driver and the vehicle owner that each of them were exposed to liability in excess of the policy limits, particularly the vehicle owner if negligent entrustment was established against him. Allstate transferred the defense of both the drunk driver and the vehicle owner to the same law firm representing Allstate in the interpleader. After charges of **bad faith** by the plaintiff's then attorney, another attorney was hired by Allstate to substitute in as counsel for Allstate in the interpleader action. The original firm retained by Allstate continued to represent both the drunk driver and the vehicle owner. In June of 1981, the five other claimants settled their claims against the drunk driver and the vehicle owner in the interpleader action by stipulating to proportional shares of $ 25,000, leaving the plaintiff as the only non-settling claimant. Allstate refused to pay the remaining $ 25,000 in interpleader unless the plaintiff agreed to dismiss all claims against both the drunk driver and the vehicle owner. Allstate continued to maintain this position despite the plaintiff's offer in February of 1982 to release all claims against the vehicle alone for the remaining policy limits of $ 25,000. Allstate conceded that had it accepted this offer, the policy language would have required it to continue to defend the drunk driver with the $ 25,000 settlement against the vehicle owner constituting a credit/offset relative to any future recovery against the drunk driver. Therefore, the plaintiff contended that the drunk driver would not have been harmed in any way if Allstate had settled out all claims against the vehicle owner, since the drunk driver would have received all of the benefits provided by the terms of the insurance policy. Thereafter, Allstate adopted a broad interpretation of the interpleader court's order releasing Allstate from further liability, claiming that the plaintiff could never sue Allstate for breach of its Insurance Code Sec. 790.03(h)(5) duties that it directly owed to the plaintiff even if and when the plaintiff obtained a final determination of liability as against either the drunk driver or the vehicle owner. During the course of the instant **bad faith** litigation, the interpleader court modified its prior 1989 order so as to allow the plaintiff to proceed against Allstate for violation of Insurance Code Sec.790.03(h)(5). Allstate continued to insist throughout the course of the plaintiff's underlying personal injury action against the drunk driver and the vehicle owner, that it would not stipulate to the release of the interpleaded funds unless the plaintiff agreed to dismiss all claims against both the drunk driver and vehicle owner and, thus, the plaintiff's personal injury claim proceeded to trial in 1987. After the defense lawyers answered ready for trial on behalf of the drunk driver and the vehicle owner in 1987 relative to the plaintiff's personal injury action, two

Superior Court Judges informed the defense lawyers and the lawyers, in turn, advised Allstate that the vehicle owner's knowledge of the drunk driver's reckless driving history preceding the subject accident, would be admitted based upon its relevance to the negligent entrustment issue. Approximately two weeks before the plaintiff's February 1982 offer of settlement to dismiss all claims against the vehicle owner alone, the drink driver testified in deposition that he was convicted on six reckless driving counts, two of which included driving under the influence of alcohol, during the one and one half year period immediately preceding the subject accident, and that the vehicle owner, the drunk driver's father, had attended all of the sentencing hearings with his son. After learning that the Trial Judge would be admitting this knowledge on the part of the vehicle owner for the purpose of establishing negligent entrustment against him, the defendant's law firm and Allstate agreed to enter into a stipulated judgment with the plaintiff whereby the drunk driver and vehicle owner were held jointly and severally liable for the amount of $ 2,500,000. In exchange for this stipulated judgment, the plaintiff agreed not to execute this judgment against any of the personal assets of either the drunk driver or the vehicle owners, and the drunk driver and vehicle owner agreed to assign any and all **bad faith** rights of theirs to the plaintiff relative to collecting the amount of the stipulated judgment from Allstate. Thereafter, in 1988, the plaintiff filed the instant **bad faith** action against Allstate, claiming his entitlement to collect from Allstate the $ 2,500,000 stipulated judgment entered against the vehicle owner as a negligent entrustor on the grounds that the vehicle owner could have avoided this judgment had Allstate agreed in February of 1982 to pay $ 25,000 to the plaintiff in exchange for the plaintiff dismissing all claims against the vehicle owner alone. The plaintiff additionally sued Allstate under Insurance Code Sec. 790.03(h)95) for its failure to promptly, fairly and equitably settle the plaintiff's claims against the vehicle owner for negligent entrustment once this became reasonably clear. The plaintiff claimed special damages of the loss of use for seven years of the underlying defendant vehicle owner's policy limits of $ 25,000. The plaintiff additionally claimed damages for emotional distress caused by the defendant Allstate's failure to tender to him $ 25,000 in February of 1982 for a release of all claims against the vehicle owner alone. At the Mandatory settlement conference the plaintiff demanded $ 4,000,000 and the defendant offered $ 50,000. The Trial Court refused to instruct the jury on punitive damages. The jury reached a special finding that Allstate breached its implied duty of good faith and fair dealing owed to the insured/vehicle owner and on this basis, awarded the plaintiff $ 2,500,000 against Allstate. In addition, the jury awarded the plaintiff an additional $ 1,000,000 for emotional distress damages.

**Defendant Experts:** Defendant's legal experts: Herbert Hiestand, Jack Conway and retired Superior Court Judge George Dell, all from Los Angeles

**Commentary:** The plaintiff did not utilize independent expert testimony on the issues of liability, but successfully sought to establish its cause of action against the defendant insurance company through Evidence Code Sec. 776 cross-examination of Allstate claims adjuster, Allstate Claims Manager/Corporate Designee, Allstate's appointed defense counsel in the underlying action, as well as through detailed cross-examination of Allstate's expert retired Superior Court Justice. The plaintiff's case was facilitated by evidence indicating none, but several mistakes made by the defendant insurer in the handling of the underlying claim which resulted in exposing its insured, the owner of the vehicle, to personal liability in the millions. Specifically, the evidence showed that the defendant insurer had failed to apprise both the vehicle owner and the vehicle driver of their potential exposure to personal liability. Further, the defendant failed to offer any amount of money to any claimant for a release of all claims as against the vehicle owner alone, once liability on a negligent entrustment theory became reasonably clear. Additionally disturbing was the evidence revealing that the defendant permitted a conflict of interest to exist between the vehicle owner and the vehicle driver with regard to legal representation.

**Issue:** Published in Volume 7, Issue 2

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury**

**34**
**Exh. 7**

3 of 4                                                                                                    5/21/2008 10:09 AM

LexisNexis® *Total Research System*

☐ Switch Client | Preferences | Sign Off | ❓ Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ⓘ
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

© 1990 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

Copyright 1990 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

GEORGIA QUILL vs. STATE FARM MUTUAL **AUTOMOBILE** INSURANCE COMPANY

Case No. 44-45-34

**Verdict Date:** Verdict Date: May 16, 1990;

**Publication Date:** Publication Date: September, 1990

**Topic: Bad Faith** Insurance Action - Defendant insurer intentionally delays in making offer of settlement in clear liability case - Plaintiff sought to recover emotional distress and punitive damages

**Result:** $ 1,350,000 verdict including $ 1,000,0000 punitive award

**Title:** Insurance Liability; **Bad Faith**

**State:** California

**County:** Orange County

**Judge:** Judge Richard Luesebrinh

**Plaintiff Attorney:** Roger L. Gordon and Steven J. Kleifield of Gordon, Edelstein, Krepach, Grant, Felton & Goldstein in Los Angeles

**Defendant Attorney:** Donald McKay and Michael Madigan of Hillsinger & Costanzo in Orange, Ca.

**Plaintiff Cause:** The female plaintiff in this action was a passenger in a vehicle which was broadsided by a drunk driver insured by the defendant State Farm. The plaintiff contended that the defendant State Farm acted in **bad faith** in the handling of the plaintiff's claim arising out of the **automobile** accident by intentionally and unnecessarily delaying in making offer of settlement until three and one half years after the accident. In this **bad faith** action, the plaintiff sought to recover damages for emotional distress and punitive damages.

The evidence indicated that the plaintiff suffered personal injuries in a two vehicle accident caused by the defendant's insured, a drunk driver who ran a red light and broadsided the vehicle in which the plaintiff was riding as a passenger. After what the plaintiff alleged was an unnecessary delay of three and one half years, the defendant offered the policy limits, which the plaintiff rejected. At the trial of the underlying action, the plaintiff was awarded $ 280,000. The plaintiff thereafter brought the subject **bad faith** action.

The plaintiff contended that the liability of the defendant's insured with regard to the

**automobile** accident was clear, and maintained that the damages suffered by the plaintiff were well in excess of the policy limits. The plaintiff alleged that an offer of settlement should have been forthcoming within one year of the date of the accident. The plaintiff called State Farm employees in its case in chief, who were shown detailed medical reports with overhead projectors to refute their testimony that medical information which they received regarding the plaintiff's injuries was unclear. On the issue of damages, the plaintiff contended that as a result of delay, the plaintiff encountered credit problems and difficulty in her marriage eventually leading to a divorce. The plaintiff and defendant stipulated to the defendant's net worth, which was offered on the issue of punitive damages.

**Defendant Contentions:** The defendant countered that the delay was justified based upon inconsistent medical reports and lack of sufficient information upon which to base a final determination. The defendant additionally contended that any delay was caused by the plaintiff and her counsel's failure to cooperate with the defendant.

**Plaintiff Experts:** Plaintiff's insurance company practices expert: David Isselhard from Santa Ana, Ca.

**Issue:** Published in Volume 5, Issue 10

Source:  Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** 
Terms:  **BAD FAITH AND AUTOMOBILE**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, May 21, 2008 - 1:00 PM EDT

LexisNexis®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**LexisNexis** *Total Research System*

☐ Switch Client  | Preferences | Sign Off | ❓ Help

**Search** | **Research Tasks** | **Get a Document** | **Shepard's®** | **Alerts** | **Total Litigator** | **Transactional Advisor** | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ⓘ
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

↙Select for FOCUS™ or Delivery
☐

*© 1990 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis*

Copyright 1990 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

KHODABANDEH vs. AMERICAN INTERNATIONAL UNDERWRITER'S INSURANCE CO.

Case No. C 705 855

**Verdict Date:** Verdict Date: June 28, 1990;

**Publication Date:** Publication Date: October, 1990

**Topic:** Insurance **bad faith** - Breach of covenant of good faith and fair dealing - Action to collect excess judgment

**Result:** $ 1,207,201.83 verdict

**State:** California

**County:** Los Angeles County

**Judge:** Judge Robert Mallano

**Plaintiff Attorney:** Bruce M. Brusavich of Agnew & Brusavich in Los Angeles

**Defendant Attorney:** Judith Gold of Lynberg & Watkins in Los Angeles

**Facts:** The plaintiff in this action was a female injured in an **automobile** accident while riding as a passenger in a car owned by the defendant's insured and driven by the insured's brother who, as a family member, was an additional insured under the applicable **automobile** policy. In this lawsuit, the plaintiff contended that the defendant insurer breached the covenant of good faith and fair dealing to its insureds by refusing to timely accept the plaintiff's "policy limits" demands and by failing to timely pay the policy limits once liability and the extent of the plaintiff's injury became reasonably clear. The underlying **automobile** accident occurred on September 8, 1985, when the host vehicle entered a controlled intersection on a green light and an uninsured motorist made a sudden left turn in front of the host vehicle, striking the driver's side of the car and causing the host vehicle to swerve and strike a light pole on the right side. The plaintiff's dominant right arm was severed at the elbow and she sustained fractures of her cervical spine at C- 1,C-2, non-displaced with no cervical compromise. On September 16, 1985, the plaintiff's husband retained counsel, who wrote the adjusting company on September 25, advising of his representation and asking that an investigation be completed within 60 days and that the plaintiff would "entertain an offer to settle for policy limits," whatever they were. He also demanded disclosure of the policy limits and offered to provide medical authorizations. Thereafter, the plaintiff's counsel provided medical authorizations signed by the plaintiff's husband "on behalf of Azam Khodabandeh, his wife." The hospital subsequently refused to honor the authorizations to provide medical records to the defendant insurer. On October 28, 1985, plaintiff's counsel demanded $ 600,000.00 liability

limits plus $ 60,000.00 UM limits, believing those were the policy limits. Thereafter, the adjuster advised that the policy limits were $ 300,000.00, not $ 600,000.00. On November 22, plaintiff's counsel wrote demanding $ 300,000.00 plus $ 60,000,00 UM benefits and gave the insurer until December 2, 1985. Thereafter, the plaintiff's counsel gave the carrier until December 4 to pay the policy limits. The evidence indicated that by September 26, 1985, the insurance adjuster had obtained the police report and had taken recorded statements of both the insured and his brother, the host driver, and concluded that 100% of fault rested with the uninsured driver. The adjuster advised plaintiff's counsel on November 22 that he had not yet submitted a report to the home office and that it would take several weeks before he received a response to the plaintiff's demand. Thereafter, the insurer paid $ 5,000 med pay policy limits and $ 60,000 UM benefits by December 15, 1985. In June of 1985, the carrier offered the remaining $ 240,000.00 under the policy, but the offer was refused by the plaintiff. Litigation proceeded and the matter was submitted to a retired judge who found the plaintiff's damages to be $ 1,000,000.00 plus $ 58,000.00 medical expenses. No determination of liability was made. This figure was the basis for a stipulated judgment entered against the insured who assigned his rights against the carrier for any excess judgment in exchange for a covenant not to execute. The carrier then paid the remaining $ 240,000.00 policy limit and this action followed. The plaintiff contended that the insurer breached the covenant of good faith and fair dealing to its insureds by refusing to accept the plaintiff's "policy limits" demands and pay the policy limits by December 4, 1985. The plaintiff further asserted that the defendant failed to conduct a prompt and thorough investigation and failed to act reasonably upon what information the defendant did uncover and tender the policy limits. The plaintiff contended that the information obtained through the defendant's limited investigation sufficiently indicated possible liability on the part of its insured. Specifically, the defendant had obtained the police report which revealed the absence of any evasive maneuvering undertaken by the insured prior to impact. In addition, during the defendant's post-accident investigation, the carrier took a statement from the insured which indicated possible inattentiveness and excessive speed on the part of the insured driver. The plaintiff contended that in view of the indication of negligence on the part of its insured contributing to the subject accident, the serious injuries suffered by the plaintiff passenger, and the fact that joint and several liability applied, the defendant insurer acted improperly and breached the duty owed to its insured by failing to tender a timely settlement offer. The defendant claimed under the facts that the adjuster acted reasonably in concluding that the uninsured driver was the sole cause of the accident. The defendant contended as a matter of law that plaintiff's counsel never made a demand within the policy limits since total limits were $ 300,000 inclusive of UM and, therefore, there was no breach of the covenant of good faith and fair dealing. The defendant further asserted that the plaintiff's counsel provided an invalid authorization for release of medical records and that medical records were necessary to honor a claim of this size. The plaintiff countered that the defendant had received medical bills which specifically documented the medical treatment for which the bills were issued. The evidence indicated that the medical bills received by the insurer contained a clear description of the injury and treatment rendered. The defendant additionally maintained that the carrier did not participate or consent to the stipulated judgment and, therefore, is not bound by the judgment. The defendant claimed that the policy only requires the carrier to pay for judgments entered after "trial" and that, in any event, the covenant not to execute resulted in no damage to the insureds. The Court granted the plaintiff's Motion in Limine and held that if the defendant breached the covenant of good faith and fair dealing, then the carrier is bound by the judgment entered in the underlying action, absent fraud or collusion. Therefore, the case proceeded to jury trial on the issue of whether the plaintiff's prior counsel had made a demand within the policy limits and, if so, whether the defendant unreasonably refused to accept the policy limit demand. The jury answered both questions in the affirmative. Therefore, the Court took additional evidence based upon which it was determined that the plaintiff was entitled to judgment in the amount of $ 1,207,201.83. The plaintiff had filed a Sec. 998 statutory demand in September of 1989 of $ 950,000, subsequently reduced to $ 750,000 before trial. The defendant had tendered an offer of $ 100,000 before trial increased to $ 250,000 at the conclusion of the plaintiff's case and following the Court's denial of the defendant's motions for directed verdict.

**Plaintiff Experts:** Plaintiff's insurance/legal experts: Frederick J. Lower from Loyola Law School
Plaintiff's insurance expert: Duane Comport from Wisconsin

**Defendant Experts:** Defendant's insurance experts: David Graf and David Isselhard, both from Santa Ana, Ca.

**Commentary:** Critical to the favorable plaintiff's outcome was the evidence establishing that the plaintiff's lawyer had sent numerous correspondences to the defendant insurer requesting the insurer to consider the impact of joint and several liability and further inviting the defendant to take whatever steps it deemed necessary to apprise itself of the plaintiff's resulting injury, including a personal examination of the plaintiff, all of which efforts were completely ignored by the defendant. The jury apparently felt that the defendant, during the trial, failed to adequately justify its failure to respond to plaintiff's counsel's good faith overtures to effect a prompt and reasonable resolution of this case. In addition, it is believed that the jury was very much offended by the evidence indicating a complete lack of communication between the defendant insurer and its insured, to whom the defendant owed a fiduciary duty, regarding ongoing matters concerning the case and the potential effect upon the insured.

**Issue:** Published in Volume 5, Issue 11

Source:  Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** 
Terms:  **BAD FAITH AND AUTOMOBILE**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, May 21, 2008 - 1:03 PM EDT

About LexisNexis �ı Terms & Conditions  ⁚ Contact Us
**LexisNexis®**  Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**LexisNexis®** *Total Research System*

☐ Switch Client | Preferences | Sign Off | ❓ Help

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Couns

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** ℹ️

Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

☞ Select for FOCUS™ or Delivery
☐

© 1988 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

Copyright 1988 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

JOHNICE BROOKS vs. MERCURY CASUALTY CO.

Case No. 44 13 23

**Verdict Date:** Verdict Date: March 4, 1988;

**Publication Date:** Publication Date: November, 1988

**Topic: Bad faith** insurance action - Failure of defendant insurer to offer settlement in clear liability case

**Result:** $ 320,000 verdict including $ 300,000 punitive damages

**Title:** Insurance Negligence; Failure to timely pay Claim

**State:** California

**County:** Orange County

**Judge:** Judge Donald Smallwood

**Plaintiff Attorney:** Ronald B. Schwartz of Newport Beach, Ca.

**Defendant Attorney:** Ilse Harle DiPinto of Grace, Nuemeyer & Otto in Santa Ana, Ca.

**Plaintiff Cause:** This was an action brought by the 39-year-old plaintiff medical assistant, who was involved in a two car **automobile** collision with a vehicle insured by the defendant Mercury Casualty. The plaintiff contended that the defendant Mercury Casualty Company knowingly violated Insurance Code Sections 790.03(h)(3), (5) and (13), in that the defendant lacked a proper Claims Manual, failed to make any offer of settlement, and failed to give an explanation to the statutory demand for settlement.

The subject accident occurred on September 6, 1982. Both the police report and subsequent independent investigation by the defendant indicated liability was clearly adverse to its insured, who had run a red light. The plaintiff suffered cervical and lumbar sprains and obtained treatment from her employer/physician as well as being referred to an orthopedic surgeon. Although the plaintiff had been involved in two prior auto accidents in which she suffered injuries to her neck and back, she had not received treatment for any of those conditions for approximately one year prior to the subject accident. The plaintiff's attorney at that time agreed to have the plaintiff examined by a defense doctor at Mercury's request prior to the filing of a lawsuit on stipulation there would be no further medical examinations once litigation began. The defense physician found that the lumbar and cervical strains had resolved. The plaintiff continued to experience symptoms in the cervical area and continued to treat. The

plaintiff's medical specials totaled $ 3,000.

Prior to the filing of suit, the plaintiff made a statutory demand for the $ 15,000 policy limits. The defendant and it's in- house counsel took the deposition of the plaintiff and sent Interrogatories and Requests for production.

Demand for Arbitration was made and no offer of settlement was made prior to the Arbitration or during the course of the Arbitration. The award of the Arbitrator was $ 16,000 plus costs. The judgment was paid and the subject lawsuit was thereafter filed for violations of Insurance Code 790.03(h).

**Defendant Contentions:** The defendant contended that they could not properly evaluate the case without the medical reports or records, which they did not receive until six days before the arbitration hearing and after they subpoenaed the records. The defendant additionally asserted that they had a written claims manual that came into effect at some point during the handling of the underlying action. The defendant further contended that no specific rejection of the demand was ever made. The jury found for the plaintiff and returned a verdict of $ 320,000 including $ 300,000 punitive damages.

**Plaintiff Experts:** Plaintiff's insurance claims expert: John Tyson from Orange, Ca.

**Defendant Experts:** Defendant's expert insurance executive: Richard S. King from San Diego, Ca.

**Issue:** Published in Volume 3, Issue 12

---

Source:  Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** 
 Terms:  **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)
  View:  Full
Date/Time:  Wednesday, May 21, 2008 - 1:01 PM EDT

---

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

LexisNexis® | About LexisNexis · Terms & Conditions · Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** i
Terms: **BAD FAITH AND AUTOMOBILE** (Edit Search | Suggest Terms for My Search)

☞ Select for FOCUS™ or Delivery
☐

© *1988 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis*

Copyright 1988 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

JULIE GOURLEY vs. STATE FARM MUTUAL INSURANCE COMPANY

Case No. 45 27 56

**Verdict Date:** Verdict Date: March 2, 1987;

**Publication Date:** Publication Date: August, 1988

**Topic:** Breach of implied covenant of good faith and fair dealing - Failure of defendant insurer to make timely and equitable settlement offer and to fully investigate claim - Emotional distress and anxiety

**Result:** $ 1,592,265 verdict including $ 1,576,500 punitive damages

**Title:** Insurance Liability; Breach of Covenant of Good Faith

**State:** California

**County:** Orange County

**Judge:** Judge John C. Wooley

**Plaintiff Attorney:** Wylie A. Aitken of Santa Ana, Ca. and Wayne J. Austero of Newport Beach, Ca.

**Defendant Attorney:** James Crandall of the Law Offices of Hill, Gensen, Even, Crandall & Wade in Santa Ana, Ca.

**Plaintiff Cause:** The 45-year-old female plaintiff insured alleged that the defendant insurer was liable for breach of the implied covenant of good faith and fair dealing implicit in the plaintiff's **automobile** insurance policy, by its mishandling of the plaintiff's policy claim submitted under the uninsured motorist's portion of her **automobile** insurance policy following her involvement in an **automobile** accident with an intoxicated uninsured motorist.

On December 19, 1981, the plaintiff was involved in an **automobile** accident on Jamboree Road in Newport Beach with an intoxicated uninsured motorist. The plaintiff suffered a fractured shoulder injury and subsequently submitted a claim to the defendant State Farm under the uninsured motorist portion of her **automobile** insurance policy. In the underlying case, the plaintiff offered to settle her claim with the defendant for an amount within the $ 100,000 policy limits. The offer was refused and the plaintiff was forced to arbitrate the matter. During the course of the underlying action, the defendant's offer was $ 25,000 for the settlement of the plaintiff's claim. The matter was submitted to arbitration and the arbitrator awarded a total of $ 88,637 to the plaintiff on November 29, 1984, approximately three years after the initial

**automobile** accident. The plaintiff then proceeded to trial against the defendant State Farm based upon the defendant's breach of the implied covenant of good faith and fair dealing. The plaintiff alleged that the defendant breached the implied covenant of good faith and fair dealing implicit in every contract, by its failure to make a prompt and equitable settlement offer, by its failure to undertake a thorough investigation of the plaintiff's claim, by its improper utilization of a frivolous "seat belt" defense in the arbitration against their own insured and grossly under-evaluating the nature and extent of the plaintiff's injuries. The plaintiff alleged that the defendant had a duty to make a prompt, fair and reasonable settlement offer due to the fact that liability was clear from the date of the accident and the defendant was well aware of the extent of plaintiff's injuries and resulting disability. The plaintiff claimed damages for emotional distress and anxiety resulting from the defendant's failure to promptly and fairly negotiate a reasonable settlement. The plaintiff additionally claimed damages for the loss of the use of funds die to the delay of the defendant in paying the plaintiff's claim.

**Defendant Contentions:** The defendant took the position that it was justified in asserting a valid legal defense, the seat belt defense, to mitigate damages. The defendant maintained that if the plaintiff had worn a seat belt the night of the accident, she would not have been injured, thus validating the defendant's determination not to pay the plaintiff's claims in full. The defendant additionally contended that the plaintiff's attorney on the underlying action failed to deal with the defendant in good faith, thereby establishing comparative **bad faith.** The jury found for the plaintiff and returned a verdict of $ 15,765 general damages and $ 1,592,265 punitive damages.

**Plaintiff Experts:** Plaintiff's insurance experts: Vern Hunt from Santa Ana, Ca. and G. Dana Hobart in Marina Del Rey

**Defendant Experts:** Defendant's insurance experts: Hugh Donahue, Claims Supervisor for Farmers Insurance in Los Angeles, Ca., John Rath, Claims Supervisor for Hartford Insurance in Los Angeles, Arthur Schaertel, Attorney from Los Angeles, and Barry Allen, Attorney from Los Angeles

**Issue:** Published in Volume 3, Issue 9

Source:  Legal > States Legal - U.S. > California > Find Briefs, Motions, Pleadings & Jury Verdicts > **California Jury Verdicts, Combined** 
Terms:  **BAD FAITH AND AUTOMOBILE**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Wednesday, May 21, 2008 - 1:02 PM EDT

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

® LexisNexis®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.